Argued and submitted December 4, 2014, affirmed March 25, 2015

BRIDGE CITY FAMILY MEDICAL CLINIC, P.C.,
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

KENT & JOHNSON, LLP,
an Oregon limited liability partnership;
Christopher H. Kent;
and Leslie S. Johnson,
*Defendants-Respondents.*

Multnomah County Circuit Court
121215890; A155048

346 P3d 658

Terrence J. Slominski argued the cause for appellant. With him on the briefs was David W. Venables.

Thomas H. Tongue argued the cause for respondents. With him on the brief were Brian R. Talcott and Dunn Carney Allen Higgins & Tongue LLP.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

This appeal presents an issue of contract formation. Defendants represented plaintiff in an arbitration. Dissatisfied with the result, plaintiff contacted defendants' malpractice insurer, the Professional Liability Fund (PLF), regarding possible claims against defendants. Bunker, plaintiff's president, and Schafer, the adjuster on behalf of the PLF, exchanged several emails discussing a settlement. When plaintiff later brought this action, defendants moved for summary judgment, arguing that a binding settlement agreement had been reached. The trial court agreed, granted defendants' motion, and entered a judgment of dismissal. We affirm.

The issue on appeal turns entirely on the interpretation of correspondence that began on August 15, 2012, when Bunker first emailed Schafer. Bunker sent Schafer an email stating that she believed she was "entitled to something" as a result of how defendants had represented plaintiff during an arbitration. Her email included this text:

"I would like to discuss with you the option of a settlement. If there is a relatively reasonable but comparatively small amount of money that we could agree on to settle this matter I believe it would be mutually beneficial."

In a letter to Bunker dated August 20, 2012, Schafer wrote, "If you are interested in trying to resolve the claim for 'a comparatively small amount of money,' then I suggest you make a specific proposal that the PLF might consider."

On August 21, Bunker emailed back, "This is in response to your letter I received today. I am willing to settle this and move on for $40,000."

In a letter dated August 23, Schafer wrote the following:

"This will respond to your August 21, 2012 email proposing a settlement of $40,000.

"The PLF, on behalf of Kent & Johnson, will pay Bridge City Family Medical Clinic, P.C., the total sum of $10,000 in return for Bridge City's and your release of [defendants]. In addition, Kent & Johnson offer to release Bridge City and you from claims for reimbursement of $5,506.25 paid

by Kent & Johnson to Judicial Dispute Resolution, LLC on Bridge City's behalf after Bridge City failed to pay that bill. For your information, enclosed is a copy of Judicial Dispute Resolution's July 13, 2011 invoice and Chris Kent's October 13, 2011 letter to you. If settlement on these terms is acceptable, I will prepare the necessary Mutual Release.

"I want to remind you that the PLF is [defendants'] professional liability carrier. Our interests are adverse to yours and to those of Bridge City. I encourage you and Bridge City to obtain your own independent legal advice before you agree to any settlement or sign any settlement documents."

On August 27, Bunker sent Schafer a short email stating, "This will respond to your letter dated August 23, 2012 proposing a settlement of $10,000. I am willing to meet you in the middle and settle this matter immediately for $20,000."

Schafer responded to Bunker with a letter dated August 28:

"This will respond to your August 27, 2012 email to me proposing a settlement of $20,000.

"The PLF, on behalf of Kent & Johnson, will pay Bridge City Family Medical Clinic, PC the total sum of $13,500 in return for Bridge City's and your release of [defendants]. In addition, Kent & Johnson continue to offer to release Bridge City and you from claims for reimbursement of the $5,506.25 paid by Kent & Johnson to Judicial Dispute Resolution, LLC.

"If these terms are acceptable, please confirm and I will draft an appropriate settlement document."

On August 29, Bunker emailed her response to Schafer, rejecting the $13,500 offer:

"This is in response to your letter I received today dated 8/28/12. Your first counter offer of $10,000 was 25% of what I originally asked you for in my first letter. You point out that Mr. Kent and Ms. Johnson have offered to release me from the $5506.25; however they have already dismissed that claim against me as was noted in a letter to me in October of 2011. In response to your offer of $10,000, I again moved 50% to the middle at $20,000, in

response you offered to move again about 25% to $13,500. By settling this claim now, nearly a year before the statute of limitations expires, I will be walking away from a claim that potentially may settle in my favor for hundreds of thousands of dollars. As such, I continue to remain torn as to the best course of action. Please meet me close to the $20,000 mark. I am willing to settle for $19,000."

Schafer replied to Bunker in a letter dated August 30, increasing PLF's offer to $15,000:

"This will respond to your August 29, 2012 email to me proposing a settlement of $19,000.

"The PLF will pay $15,000 to settle this claim. All of the other terms are the same as my letter to you of August 28, 2012.

"If this is acceptable, I will prepare the Mutual Release for your review."

In a September 6 reply email, Bunker rejected the latest offer and stuck to the $19,000 number:

"This is in response to your most recent letter dated August 30, 2012 proposing a settlement for $15,000.

"I am still of the mind that I deserve to be compensated fully * * *. I originally asked for $40,000, which is a mere pittance comparatively. I continue to be willing to settle this for $19,000."

The correspondence continued with a September 7 letter from Schafer to Bunker:

"I am in receipt of your September 6, 2012 email renewing your offer to settle the claim against Kent & Johnson for $19,000.

"The PLF and Kent & Johnson accept your offer. Enclosed are duplicate originals of the Mutual Release I have prepared for your review and signature, if it is acceptable. Kent & Johnson have already approved it.

"If the Mutual Release is acceptable, please have it signed by Bridge City Family Medical Clinic, PC and you in the presence of a Notary Public and send one of the originals back to me. I have sent duplicate originals to Kent & Johnson for their signature and return to me and I will provide one to you once the document is fully executed.

"I have obtained a check in the amount of $19,000, payable to Bridge City Family Medical Clinic, P.C. We will hold that check until we receive a complete set of signed documents from you and Kent & Johnson. Once we have all the documents signed, we will transmit the settlement check to you. The Mutual Release will not be effective until all the parties have signed it. Signatures in counterpart are authorized in the Mutual Release.

"* * * * *

"I encourage you to consult with independent counsel of your choice, at your expense, regarding the terms of this Mutual Release. You are under no pressure to sign anything until you have had that opportunity. Whether you consult with outside counsel is up to you, but I want to be sure you have the opportunity if you choose to do so."

On September 24, having received no answer to his September 7 letter, Schafer wrote Bunker another letter reminding her that he was waiting for her response. On October 9, still having heard nothing, Schafer wrote the following letter:

"The purpose of this letter is to follow-up on my letter to you of September 24, 2012.

"You made a settlement offer on September 6, 2012, which was accepted by my letter to you of September 7, 2012. The PLF is ready to perform our settlement, and in fact, I have a settlement check in my file in the amount of $19,000, payable to Bridge City Family Medical Clinic, PC. I will send that check to you once the settlement documents are fully executed and in my possession.

"I look forward to receipt from you of the Mutual Release, executed by you and Bridge City Medical Clinic, PC. If there are any specific concerns you have with respect to the terms in the Mutual Release, please let me know. I would like to complete performance of our settlement."

Three weeks later, on October 30, 2012, plaintiff's attorney sent Schafer a letter stating that plaintiff "asked me to review the proposed settlement agreement as well as her files. She has decided not to settle on the terms set forth in your recent correspondence or, at this time settle."

On November 1, Schafer sent a letter to plaintiff's attorney stating, among other things, that plaintiff

"made a proposal, and we accepted it. Notwithstanding her unwillingness to sign the Mutual Release I sent to her, there is a settlement. If you and she want to discuss modification of the wording of the Mutual Release, I am amendable to those discussions, but this claim was settled, and the PLF and Kent & Johnson are ready, willing, and able to fully perform as agreed. The essential terms of the deal were agreed upon, and the settlement is enforceable."

Plaintiff subsequently brought this case against defendants, alleging professional malpractice. Defendants moved for summary judgment on the ground that the claim had been settled as a result of the communications between Bunker and Schafer. Defendants also served a request for admission that asked plaintiff to "[a]dmit that as a result of Exhibits A through N [the correspondence between Bunker and Schafer], the claim of plaintiff against defendants was agreed to be settled for a payment of $19,000 by the PLF and the mutual release of claims between defendants and against plaintiff." Plaintiff denied the request for admission.

The trial court granted defendants' summary judgment motion and entered a judgment of dismissal. The trial court later entered a supplemental judgment awarding defendants $6,385.50 in attorneys' fees and $1,030.00 in costs that defendants incurred because of plaintiff's denial of the request for admission. On appeal, plaintiff assigns error both to the trial court's grant of summary judgment and to the award of fees and costs. As to the latter, plaintiff contends that, at a minimum, plaintiff had an objectively reasonable belief that no enforceable settlement agreement had been reached.

We first consider whether the trial court correctly granted defendants' motion for summary judgment. When reviewing an order granting a motion for summary judgment, we view the record in the light most favorable to the nonmoving adverse party, and will affirm if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Dial Temporary Help Service v.*

*DLF Int'l Seeds*, 255 Or App 609, 610, 298 P3d 1234 (2013) (citing *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997)). Whether a contract was formed is a question of law. *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 355, 709 P2d 727 (1985) (citing *Quillin v. Peloquin*, 237 Or 343, 391 P2d 603 (1964)).

Even when it has not been reduced to a formal writing, a valid contract can be created "by [an] offer and its unqualified acceptance." *Williams v. Burdick*, 63 Or 41, 49, 125 P 844, 126 P 603 (1912). To determine whether the parties intended to enter into a binding agreement, Oregon courts "examine the objective manifestations of intent, as evidenced by the parties' communications and acts." *Hevner*, 76 Or App at 354. Those manifestations of intent must show that there has been a "meeting of the minds" as to the contract's terms and that no material terms remain for future negotiation. *Phillips v. Johnson*, 266 Or 544, 555, 514 P2d 1337 (1973). Thus, the offer to form a contract "must be certain so that upon an unqualified acceptance the nature and extent of the obligations of each party are fixed and may be determined with reasonable certainty." *Klimek v. Perisich*, 231 Or 71, 78-79, 371 P2d 956 (1962). Likewise,

> "the acceptance must coincide with and be in the same terms as the offer, and * * * if a new provision is suggested the answer is a mere counter-offer, and, until that has been assented to by the one making the offer, there is no meeting of the minds and hence no contract."

*Small v. Paulson*, 187 Or 76, 85, 209 P2d 779 (1949).

Plaintiff argues that Bunker never made a clear, unequivocal offer capable of acceptance; rather, she merely expressed a "willingness" to settle. Plaintiff further argues that, even if there was an offer by plaintiff, Schafer's purported acceptance introduced a new term—the mutual release—that plaintiff never accepted. Plaintiff contends that, as a result, there was never a meeting of the minds between the parties on the material terms of an agreement. Defendants' view of the case is that plaintiff's *initial* communication on August 15 expressed a "willingness" to settle, Schafer's August 20 response invited plaintiff to make a specific offer, and the subsequent six communications were,

in fact, a negotiation comprising offers and counteroffers. Defendants argue that the mutual release became a material term that plaintiff tacitly accepted by failing to object when Schafer repeatedly included it.

Defendants have the better argument. Bunker's first email indicated only a desire to "discuss with [Schafer] the option of a settlement." Schafer then asked Bunker to make a proposal. After that, the nature of the communications changed. Bunker promptly responded with the statement that she was "willing to settle this and move on for $40,000." A reasonable person in Schafer's position would have interpreted that statement as an offer to settle the dispute in exchange for a payment of $40,000.

Schafer responded with a counteroffer on August 23 that included two material terms: a payment of $10,000 and the execution of a mutual release. Schafer's letter was couched unmistakably in the form of an offer of settlement. Bunker's August 27 response said, "I am willing to meet you in the middle and settle this matter immediately for $20,000." As with her previous email, Bunker communicated not merely a willingness in principle to settle the dispute, but an unconditional offer to settle immediately for a specific amount. The same can be said of Schafer's August 28 letter (another unmistakable offer that moved the dollar figure to $13,500 and reiterated the need for a mutual release) and Bunker's August 29 reply (which proposed $19,000, again without condition). Schafer's August 30 counteroffer proposed $15,000 and expressly incorporated the other terms set forth in his August 28 letter. On September 6, Bunker declined to come down any further, replying, "I continue to be willing to settle this for $19,000." On September 7, Schafer accepted.

Plaintiff's attempt to characterize Bunker's series of communications as no more than a "statement of intention" is unpersuasive. Bunker initially indicated only her desire to pursue a settlement. No response to that email could have resulted in a binding contract. After being asked by Schafer to make a "specific proposal," however, that is precisely what Bunker did. Her statements that she would settle "immediately" for $40,000, $20,000, and then $19,000 were specific

offers. The wording and tone of Bunker's emails indicate that she understood the exchange to be a negotiation toward an actual settlement, not a mere discussion. Moreover, although Schafer's communications encouraged Bunker to seek independent legal advice, Bunker's responses never made her offers contingent on review by an attorney (or on any other occurrence).

It is true that Bunker never expressly manifested her assent to the mutual release. But her express assent was not required in order for the mutual release to become a term of the contract, if Schafer would have reasonably understood Bunker to have accepted it. *See Kitzke v. Turnidge*, 209 Or 563, 573, 307 P2d 522 (1957) ("'Though assent must be manifested in order to be legally effective, it need not be expressed in words. * * * Even where words are used, a contract includes not only what the parties said, but also what is necessarily to be implied from what they said.'" (Quoting Samuel Williston, 11 *Williston on Contracts* § 22A (3d ed 1957)) (quotation marks in Williston omitted).

Under these circumstances, Schafer would have understood Bunker to have accepted the mutual release. In every one of his communications, Schafer made it clear that a mutual release would be included. In her responses, Bunker expressed no disagreement or concern regarding a mutual release. It is also significant that, in her August 29 email, Bunker said, "You point out that Mr. Kent and Ms. Johnson have offered to release me from the $5506.25; however they have already dismissed that claim against me as was noted in a letter to me in October of 2011." That statement demonstrates both that Bunker appreciated that a mutual release was to be included (she had not failed to notice or understand) and that she did not view it as a particularly noteworthy feature of a settlement. As Bunker continued to negotiate only the dollar term of the settlement and made no objection to the mutual release, a reasonable person on the other side of the negotiation would have understood that Bunker had assented to the inclusion of that term. Thus, in Bunker's final email on September 6, when she reiterated the $19,000 figure, the mutual release had become a term of the offers and counteroffers.

Plaintiff also argues that the exchange of correspondence failed to achieve a binding contract because Schafer's letter of September 7 said that the mutual release "will not be effective until all the parties have signed it." Plaintiff's argument conflates two distinct ideas. Parties can agree that a contract will not be binding unless and until it is reduced to writing. That is not what happened here. By the terms of Schafer's correspondence, the *release* was not to become effective until signed. The *contract* between the parties was achieved when they reached an accord on the dollar amount and *the fact that a release would be executed*. Thus, the signing of the release was a condition precedent to the performance of the contract, not to the formation of the contract. *See D'Angelo v. Schultz*, 110 Or App 445, 450, 823 P2d 997 (1992), *rev den*, 313 Or 209 ("Assuming that the other elements of a contract are present, a condition precedent is not a condition on which the validity of an *acceptance* is contingent; it is a condition on which *performance* is contingent." (Emphasis in original.)).

We now turn to the issue of fees and costs. Before trial, defendants served a request for admissions pursuant to ORCP 45 that asked plaintiff to "[a]dmit that as a result of Exhibits A through N [the correspondence between Bunker and Schafer], the claim of plaintiff against defendants was agreed to be settled for a payment of $19,000 by the PLF and the mutual release of claims between defendants and against plaintiff." Plaintiff denied the request for admission. After the trial court granted defendant's motion for summary judgment, defendants filed a motion pursuant to ORCP 46 C asking that the trial court award defendants the expenses they incurred as a result of plaintiff's denial of the request for admission. Plaintiff filed a memorandum in opposition to defendants' motion for expenses.[1] The trial court awarded defendants their expenses.

ORCP 46 C provides:

"If a party fails to admit the genuineness of any document or the truth of any matter, as requested under Rule 45, and if the party requesting the admissions thereafter

---

[1] Contrary to defendants' assertion on appeal, we conclude that plaintiff's memorandum adequately preserved its objections to the motion for expenses.

proves the genuineness of the document or the truth of the matter, the party requesting the admissions may apply to the court for an order requiring the other party to pay the party requesting the admissions the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 45 B or C, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that such party might prevail on the matter, or (4) there was other good reason for the failure to admit."

On appeal, plaintiff invokes the third and fourth exceptions to the rule. Plaintiff contends that it had a "reasonable ground" to believe that it might prevail on the issue of whether a binding settlement agreement was reached, and that plaintiff had "other good reason" for its failure to admit. "We review a trial court's ruling on a request for fees and expenses under ORCP 46 C for errors of law and abuse of discretion." *McConnell v. Sutherland*, 135 Or App 477, 486, 898 P2d 254 (1995), *rev den*, 322 Or 489 (1996). A trial court's "determination of whether a party reasonably believed it would prevail or had a good reason for failing to admit" is generally discretionary. *Gottenberg v. Westinghouse Electric Corp.*, 142 Or App 70, 77-78, 919 P2d 521 (1996) (citing *Adams v. Hunter Engineering Co.*, 126 Or App 392, 397, 868 P2d 788 (1994)). A trial court "abuses its discretion if it exercises that discretion in a manner that is unjustified by, and clearly against, reason and evidence." *Forsi v. Hildahl*, 194 Or App 648, 652, 96 P3d 852 (2004), *rev den*, 338 Or 124 (2005).

We are not persuaded that the trial court abused its discretion when it determined that plaintiff lacked reasonable grounds to believe that it could prevail on the contract formation issue. The content and tone of the emails are those of a negotiation. Bunker never communicated (or even hinted) to Schafer that she would need to consult with an attorney before agreeing to settlement terms—despite being urged by Schafer, beginning in his first counteroffer, to do precisely that. A fair reading of the record—one that the trial court could certainly have adopted in the exercise of its

discretion—is that Bunker wanted to achieve a settlement quickly, did so knowingly, and then had second thoughts. By the time she consulted with counsel, however, she had already entered into a binding and enforceable agreement. The trial court was also not compelled to agree that plaintiff could reasonably have viewed the settlement as contingent based on the language about the release. The communications from Schafer spelled out very clearly that what was to be contingent on signing was not the contract but the release. Even if that distinction might not have been appreciated by Bunker at the time that she was acting without representation, plaintiff was represented by counsel by the time that the request for admission was made and denied.

Plaintiff asserts several "other good reason[s]" for its denial of the request for admission. We reject these without further discussion, except to note that, contrary to plaintiff's contention, ORCP 46 C expenses are available both for failures to admit factual matters and for failures to admit legal conclusions based on fact. *McConnell*, 135 Or App at 486-87 (noting that "ORCP 45 A permits request for admissions 'of the truth of relevant matters within the scope of Rule 36 B, *including facts or opinions of fact, or the application of law to fact.*'" (brackets and emphasis in original)).

For the foregoing reasons, we conclude that the trial court correctly granted defendants' motion for summary judgment and awarded their costs and fees pursuant to ORCP 46 C.

Affirmed.